**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GENE EDWARDS,<br><br>                                     Plaintiff,<br>vs.<br><br>FORD MOTOR COMPANY,<br><br>                                   Defendant. | CASE NO. 11-CV-1058-MMA(BLM)<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>[Doc. No. 58] |

    Plaintiff Gene Edwards brings this putative consumer class action against Defendant Ford Motor Company for alleged violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* Plaintiff now moves for class certification, which Ford opposes on a variety of grounds. The matter was submitted on the papers pursuant to Local Civil Rule 7.1. For the reasons set forth below, the Court **DENIES** Plaintiff's motion for class certification.

## I. BACKGROUND

    Plaintiff sues on behalf of herself and a putative class of current and former California-based owners of the 2005 through 2007 Ford Freestyle, who paid for repairs to their vehicles' electronic throttle control ("ETC") system. [Compl., Doc. No. 1-2 at 10, ¶ 28.][1] Modern ETC systems electronically control vehicle acceleration and usually consist of a throttle body,

---

[1] All citations to documents filed on the Court's docket refer to the documents' renumbered CM/ECF page numbers, not to the documents' native pagination.

1  powertrain control module, gas pedal assembly, wiring, and various sensors. [*Id.* ¶¶ 18-19.] In
2  older vehicles, a cable linked to the gas pedal mechanically controlled acceleration.

3       Plaintiff alleges that her 2006 Ford Freestyle repeatedly stalled or accelerated forward
4  without her corresponding input while she drove at low speeds or while completely stopped. [*Id.*
5  ¶ 24.] In an attempt to rectify these problems, a Ford dealership replaced her vehicle's throttle
6  body while it was under warranty. [*Id.* ¶ 25.] However, the problem returned two years later, and
7  the out-of-warranty throttle body replacement cost Plaintiff $900. [*Id.* ¶ 26.]

8       Plaintiff alleges that the sudden, unintended acceleration she experienced, which she refers
9  to as "surging," was common in the 2005 through 2007 Freestyle model years and was the product
10 of a defective ETC system. [*Id.* ¶¶ 18-22.] She claims Ford knew about the defective ETC system
11 as early as April 2005, but failed to disclose its existence to consumers while continuing to market
12 and sell the Freestyle. [*Id.* ¶¶ 20, 22.] She alleges that Ford sold over 150,000 defective
13 Freestyles. [*Id.* ¶ 29.]

14      Plaintiff now sues "to require Ford to notify its customers and prospective customers of the
15 defect and to reimburse Freestyle owners for the costs" of any repairs to their vehicles' ETC
16 system. [*Id.* ¶ 4.]

17                        **II.   LEGAL STANDARD**

18 **A.   Class Certification**

19      A plaintiff seeking class certification must affirmatively show the class meets the
20 requirements of Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.
21 2541, 2551 (2011). First, a plaintiff bears the burden of proving that the class meets all four
22 requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *Ellis v. Costco*
23 *Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). If a plaintiff meets these prerequisites, the
24 Court must then decide whether the class action is maintainable under Rule 23(b). Here, Plaintiff
25 invokes Rule 23(b)(3), which authorizes certification when "questions of law or fact common to
26 class members predominate over any questions affecting only individual class members," and
27 when "a class action is superior to other available methods for fairly and efficiently adjudicating
28 the controversy."

The Court is required to perform a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." *Dukes*, 131 S. Ct. at 2551. "'[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with Rule 23(a) requirements." *Ellis*, 657 F.3d at 981 (emphasis in original; citations omitted). Nonetheless, the district court does not conduct a mini-trial to determine if the class "could actually prevail on the merits of their claims." *Id.* at 983 n.8; *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (citation omitted) (while the Court may inquire into substance of case to apply the Rule 23 factors, it "may not go so far . . . as to judge the validity of these claims.").

**B.     Consumers Legal Remedies Act**

The CLRA "proscribes specified 'unfair methods of competition and unfair or deceptive acts or practices' in transactions for the sale or lease of goods to consumers." *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 125 (Cal. Ct. App. 2006) (quoting Cal. Civ. Code § 1770(a)). Such acts and practices include representing that goods have characteristics that they do not have, Cal. Civ. Code § 1770(a)(5), and representing that goods are of a particular standard, quality, or grade, if they are of another, *id.* § 1770(a)(7). Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Grp.*, 38 Cal. Rptr. 3d 36, 46 (Cal. Ct. App. 2006) (citation omitted).

**C.     Unfair Competition Law**

Under the UCL, any person or entity that has engaged "in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.* § 17200. The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same

time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999) (internal quotations and citation omitted). The UCL essentially "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Id.* at 539-40 (internal quotations and citation omitted).

## III.  DISCUSSION

As explained below, Plaintiff satisfies Rule 23(a)'s commonality requirement. However, this action is not amenable to class treatment under Rule 23(b)(3) because the most basic common questions in this case–whether a defect exists and how that defect is defined–cannot be answered without individual factual determinations. In addition, individual factual issues predominate over the questions of causation and Ford's duty of disclosure under the CLRA. Because the predominance of these individualized questions is sufficient to preclude certification, the Court does not address Ford's remaining arguments against certification.

**A.     Rule 23(a)'s Commonality Requirement**

Although Plaintiff originally identified seven common questions in her Complaint, her motion for class certification identifies only three. [*Compare* Compl., Doc. No. 1-2 ¶ 30, *with* Doc. No. 58-1 at 16 (Ford's knowledge, duty to disclose, and failure to disclose).] The Complaint identifies the following common questions: (1) whether class vehicles suffer from a defect that causes surging and stalling; (2) whether the defect constitutes an unreasonable safety risk; (3) whether Ford knows about the defect and, if so, how long Ford has known about the defect; (4) whether the existence of the defect would be considered a material fact by a reasonable consumer; (5) whether Ford was or is legally obligated to disclose the defect to Plaintiff and class members; (6) whether Ford's failure to disclose the defect violates the CLRA or UCL; and (7) whether Plaintiff and class members are entitled to be notified of the defect, receive reimbursement for ETC system repairs, or both. Ford argues that these questions are not common to the class because individual factual differences exist between class members.

To show commonality, a plaintiff must demonstrate that there are questions of fact and law that are common to the class. Fed. R. Civ. P. 23(a)(2). The requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy

the rule." *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). However, it is insufficient to merely allege a common question in order to satisfy the commonality requirement. *Dukes*, 131 S. Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard."). Rather, the Supreme Court recently explained that a plaintiff must pose a question that will produce a common answer to a crucial question. *See id.* at 2551-52 ("What matters to class certification is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (citation and quotations omitted; emphasis in original). The Supreme Court emphasized that commonality requires that class members' claims "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke." *Id.* at 2551.

Here, Plaintiff has satisfied her limited burden of identifying questions common to the class, including whether a defect existed, whether Ford was aware of the existence of the alleged defect, whether Ford had a duty to disclose, and whether Ford violated consumer protection laws when it failed to disclose the existence of the alleged defect. *Accord Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010). For example, if the trier of fact determines that the Freestyle was not defective, such a threshold finding would uniformly apply to all class members' claims. Further, if the alleged defect did not pose an unreasonable safety risk, such a finding would apply to the CLRA claim on a classwide basis. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141-43 (9th Cir. 2012) ("[F]or the omission [of fact] to be material [for purposes of the duty to disclose under the CLRA], the failure must still pose safety concerns.") (internal quotations marks and citation omitted). Similarly, a finding regarding Ford's knowledge will apply to the UCL and CLRA claims on a classwide basis.

Ford contends that Plaintiff does not meet her burden under *Dukes* to affirmatively demonstrate that there is even a single common question that can resolve important issues in one stroke. "But commonality only requires a single significant question of law or fact." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (citing *Dukes*, 131 S. Ct. at 2556). Further, while Ford raises various individual differences between the class members, the

"individualized issues raised go to preponderance under Rule 23(b)(3), not to whether there are common issues under Rule 23(a)(2)." *Id.* As the Supreme Court explained in *Dukes*, the Court considered "dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine (as Rule 23(a)(2) requires) whether there *is* '[e]ven a single [common] question.'" *Dukes*, 131 S. Ct. at 2556 (emphasis in original; citation omitted). In *Dukes*, not even a *single* common question existed. *Id.* Here, however, Plaintiff has satisfied her "limited burden under Rule 23(a)(2) to show that there are 'questions of law or fact common to the class.'" *Mazza*, 666 F.3d at 589; *see also Wolin*, 617 F.3d at 1172. Nonetheless, the Court will consider Ford's arguments in its analysis of Rule 23(b)(3)'s predominance requirement.

**B.      Rule 23(b)(3)'s Predominance Requirement**

Ford argues that various individual factual questions preclude adjudication of Plaintiff's claims on a classwide basis. Of Ford's various arguments, the Court agrees with Ford that individual questions predominate regarding the existence and definition of the alleged defect, Ford's duty to disclose under the CLRA, and causation under the CLRA.

Rule 23(b)(3)'s "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance standard requires a stronger showing than Rule 23(a)'s commonality standard. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "In contrast to Rule 23(a)(2) [*i.e.*, the commonality requirement], Rule 23(b)(3) focuses on the relationship between the common and individual issues. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Id.* at 1022 (citation omitted). Accordingly, a plaintiff must demonstrate that the claims are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3rd Cir. 2008).

/ / /

### 1. Question of the Existence of a Defect

Plaintiff's claims depend on the existence of a defect that causes surging. Thus, the most fundamental questions in this case are whether the 2005 through 2007 Ford Freestyle models contain a defect that causes the cars to accelerate without corresponding driver input, and, if so, how to define the defect. *Accord Cholakyan v. Mercedes-Benz USA, LLC*, 2012 U.S. Dist. LEXIS 44073, *56 (C.D. Cal. Mar. 28, 2012) ("These safety problems and electrical failures form the gravamen of his complaint; they are critical to his ability to show materiality on his consumer protection claims . . . . ¶ Assuming *arguendo* that class vehicles experience water leaks, and that the leaks have a propensity to cause electrical malfunctions, *the crucial question that must be answered is why each class member's vehicle experienced water leaks*.") (emphasis added). However, Plaintiff does not address these threshold questions and asserts that Ford concedes that the Freestyle contains a defective ETC system. [Reply, Doc. No. 82 at 5 ("The first major issue that will need to be resolved at trial is not whether the Freestyle's ETC leads to surging in class vehicles–Ford has admitted as much–but rather when Ford knew this information.")]. To the contrary, Ford vigorously disputes that a defect exists. [*See generally* Opposition, Doc. No. 75 at 16-21.] Ford argues that the existence of a defect is not an issue that can be resolved by common proof for two reasons. First, several other systems in the Freestyle's engine independently influence the ETC system's performance. Second, Freestyle owners have reported the surge phenomenon under various driving conditions. As a result of these numerous contributing factors, Ford argues, the exact source of each class vehicle's unintended acceleration requires individualized analysis. The Court agrees and finds that the fundamental issues of the existence and definition of a defect are not amenable to resolution by proof on a classwide basis.

Ford presents uncontested expert testimony that ETC systems contain several components and operate in conjunction with other independent systems in automobile engines.[2] First, ETC

---

[2] Ford submits the expert report of Paul M. Taylor, Ph.D., P.E., which Ford produced to Plaintiff on December 5, 2011. [*See* Ex. E to Nassihi Decl., Doc. No. 75-2 at 67-83; *see also* Nassihi Decl., Doc. No. 75-1 ¶ 9.] Although Plaintiff has not objected to Dr. Taylor's expert report, the Court has undertaken to review Dr. Taylor's qualifications and opinions pursuant to the standard set forth in *Kilby v. CVS Pharm., Inc.*, 2012 U.S. Dist. LEXIS 47855 (S.D. Cal. Apr. 4, 2012). The Court finds that Dr. Taylor is a qualified expert in the field of mechanical engineering with specialized knowledge of automotive engine systems. The Court also finds that Dr. Taylor's technical and specialized knowledge support the opinions in his expert report. Finally, Dr. Taylor's report is based

1  systems contain components that "continuously monitor[] the performance of various sensors and
2  operating conditions" to "determine how much to change the throttle value position" to control
3  acceleration. [Ex. E to Nassihi Decl., Doc. No. 75-2 at 73-74, ¶¶ 13-14.] Dr. Taylor further
4  explains that various engine systems and conditions besides the ETC system can affect engine
5  surge, including:

> [C]hanging engine loads (for example, transmission loads, the air conditioner compressor, alternator, or power steering pump), issues with the fuel system (for example, fuel injectors, the fuel pump, or the fuel injection control system), ignition systems (for example, intermittent sparks, ignition timing, or the knock control system), air induction system (for example, air leaks, throttle body . . . ), the exhaust system (for example, the exhaust gas recirculation system (EGR) or vapor recovery system), and the transmission system (for example, shifting or torque converter issues).

[*Id.*]

Further, Dr. Taylor briefly suggests that the external driving conditions under which each individual class vehicle operates can affect engine surge. [Doc. No. 75-2 at 74, ¶ 16 ("[S]urging that results from a combination of factors, such as maintenance and operation of the air conditioner, will be less likely to be observed in climactic areas where the air conditioner is rarely used or for drivers who properly maintain their engines.").] Indeed, the consumer complaints Plaintiff submits in support of her motion demonstrate that putative class members experienced the surge phenomenon under various conditions. For example, Freestyle owners reported experiencing surges while driving forward at slow speeds, [Doc. No. 58-26 at 3, 19; Doc. No. 61-2 at 16], while driving in reverse, [Doc. No. 58-26 at 2, 11, 14, 18; Doc. No. 61-2 at 41-42], while starting to engage the brakes, [Doc. No. 58-26 at 2, 12; Doc. No. 61-2 at 8-9], with the brake fully depressed, [Doc. No. 58-26 at 5, 18; Doc. No. 61-2 at 7], and when the air conditioner or heater were turned on, [Doc. No. 58-26 at 9, 13]. Moreover, while some drivers reported that their vehicles entered "fail safe mode"[3] after they surged, others did not. [*Compare* Doc. No. 58-26 at

---

upon sufficient facts or data, is the product of reliable principles and methods, and a sufficient factual basis supports his opinions and conclusions.

[3] Dr. Taylor explains that failsafe mode is a safety feature that allows a vehicle's engine computer to "run at a reduced power or shut down the engine completely" when the computer "senses certain faults in the operation of components, particularly faults that have the potential to cause the engine to operate at high power when such power is not requested by the driver . . . ." [Doc. No. 75-2 at 73, ¶ 14.]

2, 6-8, 13, 15; Doc. No. 61-2 at 10 (reporting vehicles stalled or entered failsafe mode after surging), *with* Doc. No. 58-26 at 9, 17; Doc. No. 61-2 at 6-9 (no such reports).]

      Dr. Taylor ultimately concludes that, "[t]he type of surging that occurs can depend on the root cause for the surging. The root cause can depend on many factors . . . . Thus, depending on the root cause, surging by some definition may or may not be experienced by any particular current owner during the period of time of his or her ownership." [Doc. No. 75-2 at 83, ¶ 37.]

      The uncontested evidence above supports Ford's argument that in order to determine whether a defect existed and how that defect is defined, the trier of fact necessarily must determine which system in each putative class member's Freestyle was the source of that particular plaintiff's surge phenomenon and under what driving conditions the surge occurred. *Accord Cholakyan v. Mercedes-Benz USA, LLC*, 2012 U.S. Dist. LEXIS 44073, *59-*60 (C.D. Cal. Mar. 28, 2012) ("There is also no evidence that a single design flaw that is common across all of the drains in question is responsible for the alleged water leak defect. . . . [P]utative class members could trace alleged water leaks to one of several independently operating vehicle components, each of which may or may not be functioning properly.").

      In her reply brief, Plaintiff references Ford's previous filings in this case and asserts that Ford has admitted that the "root cause" of the surge phenomenon is the ETC system's inability to compensate for routine sludge buildup in the Freestyle's throttle body assembly. [Doc. No. 82 at 5.] Plaintiff then asserts that expert testimony has a limited role at the class certification phase. [*Id.*] The Court has reviewed Ford's prior filings and finds that Ford has not definitively admitted that a defect exists. Not only does Ford now vigorously dispute that a defect exists, Ford's prior filings also discussed the various other systems and driving conditions that may cause surging. [*See, e.g.*, Doc. No. 30 at 3 ("This sludge buildup may result in system disturbance, *just as other engine accessories* (such as air conditioning compressor, power steering pump, transmission, or alternators) may also cause system disturbances") (emphasis added). Thus, Ford's prior filings are consistent with its current position that surging may have multiple causes. Moreover, courts have routinely considered expert testimony at the class certification phase, and it is entirely appropriate for the Court to do so here. *See, e.g.*, *Johnson v. Harley-Davidson Motor Co.*, 2012 U.S. Dist.

LEXIS 72048, *16-*17 (E.D. Cal. May 23, 2012) (involving multiple experts, including Dr. Christine Wood, one of Ford's experts); *Cholakyan v. Mercedes-Benz USA, LLC*, 2012 U.S. Dist. LEXIS 44073 (C.D. Cal. Mar. 28, 2012); *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011).

Other courts have denied class certification motions on the basis of the plaintiff's inability to identify a common source of an alleged defect. For instance, in *Arabian*, while the plaintiffs alleged that their laptop computers failed to recognize available memory cards, they could not identify a common source of the problem, which may have resulted from "a variety of apparent causes, from the use of incompatible or bad RAM modules, to a malfunctioning LCD screen, to a software conflict between the BIOS update for new memory and the operating system, to an unspecified cause which was resolved by phone technical support." *Arabian v. Sony Elecs., Inc.*, 2007 U.S. Dist. LEXIS 12715, *38 (S.D. Cal. Feb. 22, 2007).

More recently, in *Cholakya*n, the plaintiffs alleged that a water leak in their vehicles' roofs caused electrical shorts circuits. The court found that their claims were not amenable to common proof because several independent systems, and components within those systems, could have caused the water leaks. *Cholakyan v. Mercedes-Benz, USA, LLC*, 2012 U.S. Dist. LEXIS 44073, *56-*61 (C.D. Cal. Mar. 28, 2012) ("Cholakyan has not adduced evidence that there is *a single source* of the alleged injuries suffered by putative class members, as *Dukes* demands.") (emphasis added). The court concluded that the plaintiff's "failure to identify a single part or system that [caused] the water leaks defeats" class certification. *Id.* at *73.

In contrast to these cases, *Wolin* involved a simple defect, namely a "geometry defect in the vehicles' alignment," that caused premature tire wear. *See Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168, 1170 (9th Cir. 2010). This "geometry defect" was a single, identifiable source and, unlike in *Arabian*, *Cholakyan*, and Plaintiff's case, there was no indication that any other system or component in the class vehicles influenced or combined with the alignment geometry to cause premature tire wear.

Here, while Plaintiff identifies the ETC system as the defective system, she ignores Dr. Taylor's identification of multiple other systems, components, and driving conditions that may

1  independently, or may combine to, cause surging. These other factors are analogous to the
2  multiple systems in *Cholakyan* and the multiple potential sources of the computer malfunction in
3  *Arabian*. The Court finds that the question of the existence of a defect is not capable of proof at
4  trial through evidence that is common to the class rather than individual to its members.

### 2.  Proof of Causation and Ford's Duty Under the CLRA

Ford also argues that Plaintiff cannot prove a CLRA violation on a classwide basis because the materiality of the alleged undisclosed defect varies from class member to class member. [Doc. No. 75 at 23-26.] Materiality relates to causation and Ford's duty of disclosure under the CLRA. Plaintiff replies that, in cases involving defects that pose safety concerns, materiality of an undisclosed defect may be proven on a classwide basis under the "reasonable consumer" standard. [Doc. No. 61 at 18; Doc. No. 82 at 10.]

Ford's first materiality argument involves Ford's duty to disclose the Freestyle's alleged defect. Under the CLRA, omissions of fact are actionable "only when the omission is contrary to a representation actually made by the defendant or where a duty to disclose exists." *Keegan v. Am. Honda Motor Co.*, ___ F. Supp. 2d ___, 2012 U.S. Dist. LEXIS 3007, *21 (C.D. Cal. 2012) (citing *Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d 634, 648 (Cal. Ct. App. 2006). The facts the defendant knows and conceals must be material. *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 970-71 (N.D. Cal. 2008); *see LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997). Where the alleged misrepresentation is an omission, a plaintiff must show she "would have been aware of it" had the omitted fact been disclosed. *Buckland v. Threshold Enters., Ltd.*, 66 Cal. Rptr. 3d 543, 549 (Cal. Ct. App. 2007); *see also Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011).

Ford's second materiality argument involves causation under the CLRA. "[T]he CLRA requires each class member to have an actual injury caused by the unlawful practice." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011). Under the CLRA, "[c]ausation as to each class member is commonly proved more likely than not by materiality." *Mass. Mut. Life Ins. v. Superior Court*, 119 Cal. Rptr. 2d 190, 197 (Cal. Ct. App. 2002) (quoting *Blackie v. Barrack*, 524 F.2d 891, 907 n.22 (9th Cir. 1975)).

Materiality may be proven on a classwide basis "with reference to a 'reasonable consumer' standard." *Webb*, 272 F.R.D. at 502 (citing *Mass. Mut. Life Ins.*, 119 Cal. Rptr. 2d at 197). Thus, where material misrepresentations are made, "at least an inference of reliance would arise as to the entire class." *Id.* (quoting *Vasquez v. Superior Court*, 484 P.2d 964, 973 (Cal. 1971)). "This is so because a representation is considered material if it induced the consumer to alter his position to his detriment." *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Cal. Ct. App. 2009) ("*Vioxx*"). However, where individual issues as to materiality predominate, the record will not permit such an inference. *Mass. Mutual Life Ins. Co.*, 119 Cal. Rptr. 2d at 197; *see also Webb*, 272 F.R.D. at 501-02. "[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Vioxx*, 103 Cal. Rptr. 3d at 95; *see also Stearns*, 655 F.3d at 1022-23 (quoting *Vioxx*); *Webb*, 272 F.R.D. at 502 (same).

*Vioxx* is particularly instructive. The plaintiffs in that case alleged Merck & Co. advertised its drug, Vioxx, without mentioning the risk of adverse cardiovascular risks. *Vioxx*, 103 Cal. Rptr. 3d at 89. However, the California Court of Appeal found that individual issues predominated because consumers would have differed in what they considered material. *Id.* at 98-99. Merck's expert evidence established that Vioxx increased the risk of death for only some patients, that some patients would take the drug even knowing about the risks, that some physicians would not have paid attention to statements by the drug manufacturer, and that many factors informed doctors' decisions to prescribe the drug. *Id.* Plaintiff's attempt to cabin *Vioxx* to pharmaceutical drug cases is unpersuasive. Other courts have cited *Vioxx* in a variety of contexts, and Plaintiff does not cite any authority that limits *Vioxx* to pharmaceutical drugs. *See, e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011) (applying *Vioxx* in a consumer class action involving a customer rewards program); *Webb*, 272 F.R.D. at 502 (same involving infant clothing); *Davis-Miller v. Auto. Club of S. Cal.*, 134 Cal. Rptr. 3d 551, 563 (Cal. Ct. App. 2011) (same involving roadside assistance program); *see also Konik v. Time Warner Cable*, 2010 U.S. Dist. LEXIS 136923, *26 (C.D. Cal. Nov. 24, 2010) (discussing *Vioxx* in context of cable television services).

Here, Ford presents persuasive expert evidence that the level of importance a potential car buyer places on safety concerns varies from consumer to consumer such that the reasonable consumer standard cannot be applied on a classwide basis.[4] First, Dr. Wood explains that the presence of product warnings does not necessarily mean that every consumer would notice, read, or seriously consider them. [Ex. I to Nassihi Decl., Doc. No. 75-2 at 98-99.] She explains that, when making purchasing decisions, potential car buyers consult different sources of information to varying degrees, including the car's window sticker, its owner's manual, and the internet. [*Id.* at 99.] She explains that, "[a]lthough vehicle safety is important to consumers, it is not information that is systematically reviewed by all purchasers." [*Id.* at 102.] Dr. Wood thus opines that even if Ford had knowledge of the alleged defect during the time it marketed and sold the Freestyle, "it is unlikely that all consumers considering purchase or lease of the vehicle would have noticed and read the information." [*Id.* at 99.]

Ford points out that even Plaintiff likely would not have been aware of a defect notice if one had existed. As Plaintiff testified, she purchased her Freestyle because it caught her attention while she perused the first car lot she visited. [Edwards Dep., Ex. C to Nassihi Decl., Doc. No. 75-2 at 19.] She did not research the Freestyle before buying it, recall any commercials or other Freestyle advertisements, read the owner's manual, or request a Carfax[5] report to determine the vehicle's history or safety risks. [*Id.* at 19-20, 26-27.] Although it is not clear whether she ever read the brochure the salesperson handed her, she suggests that she may not have understood the meaning of warnings or vehicle specifications even if she had read it. [*Id.* at 20.] Plaintiff's

---

[4] Ford submits the expert report of Christine T. Wood, Ph.D., in the form of a letter addressed to defense counsel, Mr. Nassihi. [*See* Ex. I to Nassihi Decl., Doc. No. 75-2 at 95-105.] Dr. Wood's expert report addressed "human attention and information processing" and opines "as to whether, had Ford disclosed the information about the alleged defect that the plaintiff claims was concealed, members of the class 1) would have been aware of such disclosures, and 2) if aware, behaved differently and would have not purchased the vehicles." [*Id.* at 96.] Mr. Nassihi certifies that Ford produced this report to Plaintiff on December 5, 2011. [Nassihi Decl., Doc. No. 75-1 ¶ 10.] Plaintiff has neither objected, nor presented counter evidence, to Dr. Wood's expert report. The Court finds that Dr. Wood is an expert qualified in the field of experimental psychology with specific knowledge of, and experience with, consumer product warnings. Further, Dr. Wood's report is based upon sufficient facts or data, is the product of reliable principles and methods, and a sufficient factual basis supports her opinions and conclusions. *See*, *supra*, n.2.

[5] "CARFAX is a private company that provides a national, online database that tracks and reports the history of vehicles concerning title, ownership, accidents, and service." *Auto Fin. Specialists, Inc. v. ADESA Phx., LLC*, 2010 U.S. Dist. LEXIS 46231, *1 n.2 (D. Ariz. May 10, 2010) (citation and internal quotations omitted).

deposition testimony demonstrates that she did not research her Freestyle ahead of time, did not seriously investigate the car on the date of her purchase, and that she essentially made her decision to purchase her car on the spot and without express concern for safety issues. Thus, Plaintiff may not have been aware of Ford's disclosure had it been made or considered it in her purchase decision. *Accord Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011) ("Defendants cite to evidence that even the named plaintiffs would not have been aware of disclosures had [Defendants] made them. For example, [one named plaintiff] testified that she never researched children's clothes online before buying them."); *Baghdasarian v. Amazon.com, Inc.*, 2009 U.S. Dist. LEXIS 115265, *15 (C.D. Cal. Dec. 9, 2009) ("Plaintiff here cannot take advantage of a presumption or inference of reliance. In this case, Plaintiff's own deposition testimony undermines his own claims, showing that he did not actually rely on Defendant's statements. Plaintiff admits that the alleged misrepresentation was not an influential factor in his decision to buy from the marketplace.")

Moreover, as Dr. Wood explains, even when consumers research a car before they purchase one, they differ as to what information they deem relevant when making purchase decisions. Not every consumer places the same level of importance on safety issues. For example, in one study of the sources of information potential car buyers consulted, of those individuals who consulted the internet,

> [a]bout half of the respondents did not mention safety as a factor in their purchase decision. Even those who did, or who rated safety as somewhat or very important, reported that they first chose the vehicle they wanted and then made sure the one they selected was one of the safest of its type. Hence, for these respondents, safety was not a primary selection criterion, but rather validation or confirmation of the selection they made. One third of the respondents reported that they believed most vehicles were quite safe and thus concentrated on the other factors, somewhat ignoring safety as a selection criterion.

[*Id.* at 101.] Dr. Wood opines that "these differences in priority make it apparent that there is considerable diversity among the respondents, and automobile buyers do not cohere into a uniform group." [*Id.*] She concludes that even if Ford had warned consumers about the alleged defect, "all of those consumers who noticed and read it would not uniformly change their buying decisions in order to avoid possible exposure to a potential safety risk, completely disregarding the many other factors that influence their vehicle purchase decisions." [*Id.* at 105.]

In addition to Dr. Wood's report, Ford notes that Plaintiff's own "behavior belies any claim that a disclosure related to the idle speed control issue in the Freestyle . . . would have been uniformly material to ordinary consumers in their vehicle purchasing decision." [Doc. No. 75 at 23.] Ford argues that Plaintiff apparently did not believe the surging posed a grave safety risk for some time. Plaintiff continued to drive her Freestyle for months and waited to take it to the dealership for repairs until she felt that the car was too unsafe to drive. [Doc. No. 75 at 9-10; *see also* Edwards Dep., Doc. No. 75-2 at 52-53.] Moreover, the fact that Plaintiff purchased a 2006 Toyota Camry after her Freestyle ceased to operate supports Ford's argument that she did not place much importance on acceleration-related safety issues even after her experience with the Freestyle.[6] The uncontested evidence before the Court supports Ford's argument that materiality varies from consumer to consumer.

The Court has reviewed *Johns v. Bayer Corp.*, 2012 U.S. Dist. LEXIS 13410 (S.D. Cal. Feb. 3, 2012), in which The Honorable Anthony J. Battaglia granted the plaintiffs' motion for class certification. However, *Johns* involved a common advertising campaign with affirmative false statements of fact, namely that Bayer's products improved men's prostate health when in fact it had no such benefit. *Id.* at *3, *16. Moreover, a review of Bayer's opposition to class certification reveals a glaring distinction between *Johns* and this case: the absence of evidence, in the form of expert testimony or otherwise, of varying reliance and materiality. Thus, when Judge Battaglia certified a class, he did not do so with such evidence before him. The same is true in *Montanez v. Gerber Childrenswear*, LLC, 2011 U.S. Dist. LEXIS 150942, *7 (C.D. Cal. Dec. 15, 2011). Although the court noted that materiality under the CLRA is *generally* amenable to

---

[6] Plaintiff purchased her 2006 Camry in early 2012, after significant press coverage of surging issues with the Camry, including a highly-publicized fatal incident in this District. [*See id.* at 17; *see also* Steve Schmidt & Debbi Baker, *Toyota to Recall 4 Million Vehicles; Changes to Address Sudden Acceleration*, San Diego Union-Trib., Nov. 26, 2009, at A-1, *available at* http://www.utsandiego.com/news/2009/nov/26/toyota-recall-4-million-vehicles/.] Plaintiff testified that she purchased her Camry despite knowledge of the Camry's widely-publicized unintended acceleration issue and without much pre-purchase research. [Doc. No. 75-2 at 40, 54-55.] Moreover, although Toyota's 2009 recall involved the 2007 through 2010 model years, Plaintiff's argument–that her Camry purchase should be disregarded because the 2006 model year did not suffer from surges–is not persuasive. Because Plaintiff did not conduct any research before she purchased her Camry, she could not have known that the 2006 model was safe at the time of her purchase.

classwide proof, the order in *Montanez* made no mention of expert testimony that directly cast doubt on this general principle.

Based on Ford's expert evidence and Plaintiff's own testimony, the Court concludes that causation and Ford's duty under the CLRA cannot be determined by common proof in this case.

### IV.  CONCLUSION

Based on the foregoing, Plaintiff does not satisfy Rule 23(b)(3)'s predominance requirement.  Accordingly, the Court **DENIES** Plaintiff's motion for class certification.

**IT IS SO ORDERED.**

DATED: June 12, 2012

Hon. Michael M. Anello
United States District Judge